**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **YVONNE K. C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 1147** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Yvonne K. C. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a brief seeking to affirm the decision. After careful review of the record and the parties' respective arguments, the Court denies Plaintiff's motion and affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB and SSI on September 11, 2017, alleging in both applications that she became disabled on August 4, 2017 due to a mild stroke, diabetes, genetic problems with her knees since birth, and obesity. (R. 155-63, 185). Born in 1967,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

Plaintiff was 50 years old at the time of her applications, making her a person closely approaching advanced age (age 50-54). (R. 157); 20 C.F.R. § 404.1563(d); 20 C.F.R. § 416.963(d). She graduated from high school and lives with her fiancé and his two children. (R. 33, 35, 186). Between March 2003 and May 2007, Plaintiff worked concessions at a movie theater, then spent seven years working as a cashier. (R. 186). She quit her cashier job on August 4, 2017 due to her conditions and has not engaged in any substantial gainful activity since that date. (R. 185).

The Social Security Administration denied Plaintiff's applications initially on September 27, 2017, and again upon reconsideration on November 9, 2017. (R. 63-99). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Cynthia M. Bretthauer (the "ALJ") on December 6, 2018. (R. 27). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from a vocational expert Theresa Kopitzke. (R. 29-62). On March 4, 2019, the ALJ found that Plaintiff's morbid obesity, cerebrovascular accident, and possible transient ischemic attacks are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16). After reviewing the evidence in detail, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform the full range of medium work. (R. 16-20). This RFC combined with Plaintiff's background resulted in a finding of "not disabled" per the Medical-Vocational Guidelines Rule 203.21. (R. 20-21). The Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

2

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in finding her capable of performing the full range of medium work; (2) erred in finding that the opinion from her treating internist Rushim Bains, M.D. was not persuasive or supported by the evidence; (3) failed to account for her morbid obesity in determining the RFC; and (4) improperly evaluated her subjective statements regarding the limiting effects of her symptoms. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not

disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.  Five-Step Inquiry**

To recover DIB or SSI, a claimant must establish that she is disabled within the meaning of the Social Security Act.[2] *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016). A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20

---

[2]  Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C. Analysis

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that she has the RFC to perform the full range of medium work, which requires the ability to lift 50 pounds occasionally and 25 pounds frequently, and sit, stand, and walk for up to 6 hours in an 8-hour workday. 20 C.F.R. § 404.1567(c); *see also Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1029 (N.D. Ill. 2009). A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct h[er] own RFC finding without a proper medical ground and must explain how [s]he has reached h[er] conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also Ana M.A.A. v. Kijakazi*, No. 19 C 7559, 2021 WL 3930103, at *2 (N.D. Ill. Sept. 2, 2021).

The ALJ found that despite suffering from morbid obesity, history of cerebrovascular accident, and possible transient ischemic attacks, Plaintiff remains capable of performing medium work without any restrictions. Plaintiff argues that this RFC is not supported by substantial evidence because the record shows she cannot sustain the necessary sitting, standing, walking, lifting, carrying, and handling requirements of such work. In support, Plaintiff relies on the October 18, 2017 opinion

from her treating internist Dr. Rushim Bains, her diagnosis of morbid obesity, and her own testimony.

### 1. Dr. Bains's Opinion

Since Plaintiff filed her claims in September 2017, the treating source rule used for claims filed before March 27, 2017 does not apply. This means the ALJ was not required to "defer or give any specific evidentiary weight" to any medical opinion, including a treating physician's opinion. 20 C.F.R. § 404.1520c(a). *See also* Social Security Administration, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819 (Jan. 18, 2017). Instead, the ALJ was required to "evaluate the persuasiveness of each medical opinion based on certain factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; and (5) other factors, including the source's familiarity with other evidence in the claim or an understanding of Social Security disability policies and requirements." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)). An ALJ must explain how she considered the first two factors (supportability and consistency) and may but is not required to explain her consideration of the other factors. 20 C.F.R. § 404.1520c(b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion." *Michelle D.*, 2022 WL 972280, at *4 (citing 20 C.F.R. § 404.1520c(c)(1)). "Consistency assesses how a medical opinion squares with other evidence in the record." *Id.* (citing 20 C.F.R. § 404.1520c(c)(2)).

Dr. Bains completed a Stroke Residual Functional Capacity Questionnaire on October 18, 2017 at the request of Plaintiff's attorney. (R. 542-47). Plaintiff had a stroke

on or about December 31, 2015, a year and a half before the August 4, 2017 alleged disability onset date. Dr. Bains described Plaintiff's prognosis as guarded and indicated that her symptoms include balance problems, poor coordination, weakness, unstable walking, difficulty remembering, and confusion. (R. 542). According to Dr. Bains, Plaintiff has significant and persistent disorganization of motor function in two extremities (her right arm and leg) resulting in sustained disturbance of gross and dexterous movement or gait and station. (R. 543). In that regard, she can only walk one city block; sit for 45 minutes before needing to get up; stand for 10 minutes before needing to sit down or walk around; and sit for 4 hours and stand/walk for less than 2 hours in an 8-hour workday. (R. 543-44). Plaintiff needs to be able to shift positions at will and must use a cane in the winter. (R. 544-45).

Dr. Bains further concluded that Plaintiff can frequently lift less than 10 pounds; rarely lift 10 or 20 pounds; and never lift 50 pounds. She can occasionally twist but never stoop, crouch, climb ladders, or climb stairs. In addition, she can grasp, turn, twist objects, perform fine manipulations, and reach overhead only 50% of the workday. (R. 545). Plaintiff must avoid even moderate exposure to extreme cold, extreme heat, high humidity, fumes, odors, gases, perfumes, cigarette smoke, soldering fluids, solvents, and chemicals. Based on Plaintiff's history of cardiovascular accident and diminished functional capacity, Dr. Bains believes she is only capable of a low stress job and would miss about 2 days of work per month due to her conditions. (R. 546-47).

In finding Dr. Bains's opinion unpersuasive, the ALJ first explained that it was not supported by the doctor's own treatment notes, which consistently documented normal gait, full strength, normal sensation, and no neurological abnormalities of any kind. (R.

19). The record amply supports this conclusion. On October 18, 2017, the same day Dr. Bains completed the questionnaire describing significant functional restrictions, he observed that Plaintiff had full range of motion in the neck, normal motor strength and tone, normal movement of all extremities, normal gait and station, intact sensation and coordination, normal mood and affect, normal recent and remote memory, and good judgment. (R. 482, 3426-27). Dr. Bains made similarly normal findings during exams on July 10, 2017 (R. 463), August 15, 2017 (R. 457, 3437), August 31, 2017 (R. 453), October 11, 2017 (R. 485, 3430), December 12, 2017 (R. 3424), March 1, 2018 (R. 3420), April 11, 2018 (R. 3416-17), May 14, 2018 (R. 3413), July 9, 2018 (R. 3413), September 17, 2018 (R. 3406), and October 1, 2018 (R. 3403).

The ALJ also reasonably concluded that Dr. Bains's opinion was inconsistent with other objective evidence in the record. (R. 19). Plaintiff was diagnosed with an acute ischemic stroke on December 31, 2015 after being admitted to the Vista Medical Center East ("Vista East") emergency department ("ED") with mumbling speech, some drift in the right arm and leg, and weakness on the right side. Though doctors expressed concern that there was "some functional element and embellishment" to Plaintiff's condition, they administered tPA treatment to counteract a stroke. (R. 17, 507, 518). A January 2, 2016 MRI of the brain showed no acute ischemia and Plaintiff began inpatient rehab. She was released on January 19, 2016 and continued with outpatient physical and occupational therapy. (R. 18, 507, 548-1016). By January 26, 2016, Plaintiff's speech and right-sided weakness had greatly improved but she was walking with a cane. (R. 3464). She was still using a cane on February 26, 2016 and reported diminished activity. An exam showed full strength of 5/5 in all extremities except the right arm, which was at a level of

4/5. Plaintiff agreed to follow up with a neurologist but refused a referral to a dietician for her morbid obesity. (R. 3461).

On March 29, 2016, Plaintiff saw family physician Pedro Palu-Ay, M.D., to have FMLA paperwork completed. Plaintiff had no complaints at that time and an exam was largely normal with full motor strength and tone, normal gait and station, and intact sensation and coordination. (R. 3457-58). A few weeks later on April 25, 2016, Plaintiff had a neurology consultation with Revital M. Marcus, M.D. She was using a 4-pronged cane and complained of residual speech difficulties and right-sided weakness that she described as "improving." (R. 18, 507). Dr. Marcus found full motor strength of 5/5 on the left, slightly reduced motor strength of 5-/5 in Plaintiff's right arm and leg, and 4/5 dorsiflexion and 3/5 EHL (extensor hallucis longus). Plaintiff exhibited diminished sensation on the right side compared to the left and her gait without the cane was "a bit slow and somewhat wide based due to body habitus." She also had mild right pronator drift and marked foot drop. (R. 18, 509-10). Dr. Marcus assessed stroke with residual mild hemiparesis and sensory loss in the right leg and arm. As a result of the right foot drop, Dr. Marcus instructed Plaintiff not to drive pending further evaluation by a physical therapist. (R. 510, 816).

When Plaintiff next saw Dr. Marcus on June 20, 2016, she reported "doing well" with improvement in her right-sided weakness and drop foot. She was still using a 4-pronged cane intermittently but wanted to return to work. (R. 519). On exam, Plaintiff had only slightly reduced motor strength of 5-/5 in the right arm "but appears strong." She had full right leg strength of 5/5 including both dorsiflexion and EHL, and she walked with a casual gait without a cane, though it was once again a bit slow and wide due to body

habitus.  (R. 520).  Dr. Marcus sent Plaintiff for MRAs of the head and neck, kept her on driving restriction due to the drop foot, and instructed her to return in three months.  (R. 521).  The June 30, 2016 MRAs were both normal.  (R. 515, 516).

Plaintiff returned to Dr. Palu-Ay on July 25, 2016, again with FMLA paperwork. She had no complaints and aside from some weakness in the right arm and leg, an exam was mostly normal with normal muscle tone, normal gait and station, and intact sensation and coordination.  (R. 3454-55).  Shortly thereafter on September 8, 2016, Plaintiff was admitted to the Vista East hospital due to speech difficulty and right-sided weakness that could evidence a possible stroke.  (R. 277).  An exam was largely normal with full range of motion and only slight loss of motor strength (4/5) on the right side.  (R. 280-81).  A CT scan of the head and a chest X-ray were both normal.  (R. 302, 1127).  A CT scan of the neck showed mild tortuosity and minimal redundancy of the cervical internal carotid arteries.  (R. 302).  Plaintiff was discharged on September 12, 2016 with full strength in all extremities, intact sensation, normal muscle tone, and full grip strength.  (R. 299, 1369).

On October 17, 2016, Plaintiff went for a neurological consultation with F. Roberto Gil, M.D.  She told Dr. Gil that she had been advised not to drive but was doing so anyway on a limited basis without concern and felt ready to resume without restriction.  (R. 18, 258).  Plaintiff complained of difficulty standing for extended periods due to fatigue, occasional tingling in the right arm, and some memory issues, but also stated that she "has been well, is cooking, [and] cleaning her house."  (R. 18, 258).  On exam, Plaintiff had full strength in both arms and legs, normal sensation, normal station, and normal ability to stand and sit, as well as normal comprehension, fluency, naming, reading, and

repetition.  (R. 18, 259).  Dr. Gil determined that Plaintiff had "[n]o significant disability despite symptoms" and was "able to carry out all usual duties and activities."  (R. 18, 259).  He released her to return to work with limited hours for the first 1-2 weeks and then increase as tolerated.  He also recommended that Plaintiff engage in physical therapy and lifestyle adjustment for her obesity, including "a good level of physical activity with at least 30 minutes of cardio . . . at least 3 times a week as tolerated."  (Doc. 18, 526).  Dr. Gil further advised Plaintiff to get a sleep study since she most likely had some degree of sleep apnea.  (R. 18, 260).

When Plaintiff saw Dr. Gil for a routine follow-up on December 5, 2016, she reported working limited hours secondary to anxiety, fatigue, and difficulty standing on her feet for extended periods of time.  (R. 18, 534).  On exam, Plaintiff had full strength in all extremities; normal sensation to light touch throughout; and normal gait, station, and ability to sit and stand.  She could walk briefly on heels and toes but could not tandem walk due to body habitus.  (R. 263).  Dr. Gil advised Plaintiff about the importance of "escalating her work activities as a significant component of recovery as well as maintaining physical activity."  He once again referred her for a sleep study to address excessive fatigue but Plaintiff never pursued an evaluation.  (R. 18, 263).  On January 16, 2017, Plaintiff told Dr. Palu-Ay that she could not walk more than 200 feet without resting, but her physical exam was entirely normal.  (R. 472, 3452).

Five days later on January 21, 2017, Plaintiff went to the Vista East ED with complaints of speech difficulties and problems moving her right arm.  (R. 333).  She had motor strength of 3/5 in the right arm, 4/5 in the left arm, and 5/5 in the legs.  All other findings were normal, as were a chest X-ray and head CT.  (R. 340, 360).  During a

neurology consult, Plaintiff's speech was inconsistent and she exhibited mild give way weakness on the right "but when pushed can give full effort." (R. 357). The neurologist did not recommend further workup, explaining that there was no evidence of ischemia on an MRI, Plaintiff's symptoms were likely functional, and she would benefit from seeing a psychiatrist. (R. 358). At the time of her discharge on January 23, 2017, Plaintiff had full strength and functioning and was able to walk 200 feet without an assistive device. (R. 1673). When Plaintiff went for a follow-up visit with Dr. Palu-Ay on January 30, 2017, she still had some weakness in the right arm and leg but she also had normal gait and station, normal tone and motor strength, normal movement of all extremities, intact sensation, and intact coordination. (R. 469, 3449).

Six months later on July 10, 2017, Plaintiff saw treating internist Dr. Rushim Bains for an assessment of her ability to return to work. An exam was normal and Dr. Bains released Plaintiff to full duty. (R. 18, 461, 463). On July 30, 2017, however, Plaintiff went back to the Vista East ED with speech difficulty and right arm weakness. Doctors doubted this was a new stroke but admitted her for observation. (R. 394). A CT scan and MRI of the brain were both normal though Plaintiff demonstrated weakness in her right hand grip strength, some concentration difficulties, and some confusion/disorientation. (R. 394, 405, 422, 424, 2029). Plaintiff was discharged on August 2, 2017 with a diagnosis of presumptive conversion disorder (a mental condition in which a person has neurologic symptoms that cannot be explained by medical evaluation). (R. 457, 1756). Plaintiff alleges that she became disabled shortly thereafter on August 4, 2017. As noted, all subsequent examinations with Dr. Bains were normal.

Plaintiff ignores most of this evidence (including the fully normal exams from August 15, 2017 through October 1, 2018) and provides no explanation as to how it supports the extreme limitations imposed by Dr. Bains or otherwise demonstrates she is incapable of medium work. Plaintiff finds it significant that Dr. Bains's August 15, 2017 treatment record included a diagnosis of "impaired mobility" and a referral for physical and occupational therapy. (R. 3437). But the stated diagnosis is inconsistent with Dr. Bains's own exam notes that day showing normal ambulation, gait, and station. In addition, Dr. Bains never mentioned the impaired mobility diagnosis again after August 2017, and there is no evidence Plaintiff pursued physical or occupational therapy. (R. 3403, 3406-07, 3413-14, 3417, 3420, 3424, 3430). Plaintiff argues that the ALJ still erred in failing to include any accommodation for off-task time and absenteeism as set forth in Dr. Bains's opinion. (Doc. 15, at 9). Dr. Bains indicated that Plaintiff seldom experiences pain, fatigue, or other symptoms that interfere with attention and concentration, and would miss about 2 days of work per month. (R. 543, 547). Once again, none of Dr. Bains's treatment notes mention such concerns and all mental status exams were normal.

Plaintiff also focuses on her hospitalizations in late July/early August 2017 and April 2018. (Doc. 15, at 8). A rehab note dated August 1, 2017 did document some sensory and strength deficits on the right side (R. 2039), but those deficits fully resolved by the time Plaintiff saw Dr. Bains on August 15, 2017. (R. 457, 3437). As for the April 15, 2018 hospital admission, an MRI did not show any acute event and Plaintiff had no neurological deficits or impairment in understanding. Doctors suspected that Plaintiff's difficulty with speech was due to lack of effort rather than an inability to speak. (R. 19, 3036). Significantly, Dr. Bains detected no deficits of any kind when he saw Plaintiff on

May 14, 2018 or thereafter. (R. 3403, 3406, 3409, 3413). Contrary to Plaintiff's suggestion, the fact that her April 2018 hospital records included a note from September 9, 2016 (nearly a year before the August 4, 2017 alleged disability onset date) that she was at risk for falls (R. 3007), in no way demonstrates this was still a problem in April 2018. As noted, Plaintiff's exams were consistently normal.

Plaintiff stresses that Dr. Bains diagnosed her with a variety of conditions, including diabetes, hyperlipidemia, hypertension, cardiovascular accident, impaired mobility, carotid artery stenosis, and conversion disorder, which she says evidences "persistent symptoms from multiple chronic impairments." (Doc. 15, at 12-13). But a diagnosis alone does not establish that an impairment is severe or disabling. Plaintiff "having been diagnosed with these impairments does not mean they imposed particular restrictions on her ability to work. . . It was [Plaintiff's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018). Plaintiff has not met that burden here.

Also unavailing is Plaintiff's objection that the ALJ committed reversible error by failing to address the length, extent, and nature of her treatment relationship with Dr. Bains, or the frequency of her visits with him. (Doc. 15, at 15-16). To begin, the ALJ was not required to specifically discuss any of these factors in her decision. 20 C.F.R. § 404.1520c(b)(2). In addition, the ALJ was clearly aware of the length and scope of the treatment relationship as reflected in her recitation of the medical record. (R. 18-19). Since the Court is able to trace the ALJ's reasoning regarding Dr. Bains's opinion, she has sufficiently built a logical bridge between the evidence and her conclusion. *Charles*

*M. v. Comm'r of Soc. Sec.*, No. 19-CV-1178-JES-JEH, 2021 WL 779979, at *3 (C.D. Ill. Mar. 1, 2021) ("The ALJ need not draft a novel to explain her reasoning. She must minimally articulate it, such that a reviewing court can trace her reasoning and her decision can be subjected to meaningful review.").

For all the reasons stated, the ALJ reasonably concluded that Dr. Bains's opinion was not supported by or consistent with the medical evidence and so was unpersuasive. As a result, the opinion does not constitute substantial evidence that Plaintiff lacks the RFC for medium work. Plaintiff's motion to remand the case for further consideration of this issue is denied.

### 2. Plaintiff's Morbid Obesity

Plaintiff argues that the RFC is still flawed because the ALJ failed to properly consider the exacerbating effects of her morbid obesity. (Doc. 15, at 9). The ALJ determined that Plaintiff's morbid obesity is a severe impairment and observed that it "can contribute to the severity of other conditions, such as cardiac, respiratory, and musculoskeletal impairments." (R. 16). The ALJ also factored Plaintiff's morbid obesity into the RFC assessment. Specifically, the ALJ rejected the State agency consultants' opinions that Plaintiff has no severe impairments at all, explaining that Plaintiff's "morbidly obese body habitus alone would be expected to affect her ability to tolerate the physical demands of heavy or very heavy work." (R. 20). The ALJ thus limited Plaintiff to no more than medium work.

Plaintiff insists this analysis is insufficient because the limitations set forth in Dr. Bains's opinion are consistent with a diagnosis of morbid obesity and necessary to account for that condition. (Doc. 15, at 11). Yet in completing the questionnaire, Dr.

Bains did not identify morbid obesity as one of Plaintiff's relevant diagnoses, citing only diabetes, hyperlipidemia, and hypertension. The ALJ reasonably found those conditions were controlled with medication and so non-severe (R. 16, 542), and Plaintiff does not challenge that aspect of the ALJ's decision. Dr. Bains also failed to document any functional limitations, or impose any restrictions related to Plaintiff's morbid obesity. To the contrary, physical examinations were routinely normal. Plaintiff does not address those normal exams or explain how they demonstrate that she has severe limitations attributable to her morbid obesity. *See Lynida W. v. Saul*, No. 19 C 2021, 2020 WL 2542156, at *4 (N.D. Ill. May 19, 2020) (quoting *Shumaker v Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015)) (ALJ properly considered the plaintiff's obesity where the plaintiff "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments.").

Plaintiff next objects that the ALJ failed to recognize that she is not merely morbidly obese but "super morbidly obese." (Doc. 15, at 9-10 and n.1) (citing *Pathophysiological and Perioperative Features of Morbidly Obese Parturients*, Medscape 2009, https://www.medscape.com/viewarticle/70352). Plaintiff does not explain the significance of this nomenclature or identify any physician who utilized that term in discussing her condition. Nor does that term appear in the Social Security regulations. In such circumstances, the Court cannot say that the ALJ committed reversible error in failing to describe Plaintiff as "super morbidly obese." *See* SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Moreover, as noted, the ALJ expressly discussed Plaintiff's weight, including

her BMI over 50, and incorporated that impairment into the RFC for medium as opposed to heavy or very heavy work.  (R. 18, 20).

Also unavailing is Plaintiff's argument that the ALJ erred by improperly noting that she did not report symptoms such as dizziness, somnolence, palpitations, or headaches, "as if those symptoms would be the only indicators of super morbid obesity."  (Doc. 15, at 10) (citing R. 16).  The ALJ cited the symptoms in question in considering the severity of Plaintiff's hypertension, hyperlipidemia, and diabetes, not her morbid obesity.  (R. 16).  There is similarly no merit to Plaintiff's suggestion that the ALJ somehow discounted the severity of her morbid obesity because doctors recommended that she try bariatric surgery, cut calories, and exercise more.  (Doc. 15, at 10).  The decision says nothing about surgery, and the ALJ only mentioned weight loss and exercise to the extent Plaintiff's physicians discussed those actions as part of her course of treatment.  (R. 18).

Plaintiff finally cites *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), for the proposition that an ALJ errs in failing to consider the effects that morbid obesity can have on a claimant's ability to work "even when not itself disabling."  (Doc. 15, at 11).  The Court agrees with this general assertion.  But the plaintiff in *Browning* had documented problems with reduced range of motion and pain in her leg which the court noted could be "aggravated by standing, since standing requires her legs to support her great weight." 766 F.3d at 707.  The court was wary of "play[ing] doctor ourselves," but held that at a minimum the ALJ needed to "instruct the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work."  *Id*.

Here, there are no objective tests reflecting that Plaintiff has any abnormalities or problems that could be exacerbated by her morbid obesity.  For the most part, MRIs,

MRAs, CT scans, and X-rays were all normal. (R. 305, 340, 360, 422, 424, 515, 516, 518, 1127). Though a neck MRI taken on February 25, 2016 showed moderate tortuosity of the interval carotid arteries and mild narrowing of the mid to distal right ICA relative to the left (R. 879), and a September 8, 2016 neck MRI showed mild tortuosity and minimal redundancy of the cervical internal carotid arteries in the neck (R. 302), all subsequent exams reflected normal neck range of motion and functioning. (R. 453, 457, 463, 485, 3403, 3406, 3413, 3420, 3424, 3430, 3437).

And to reiterate, all physical exams from August 2017 forward showed normal motor strength and tone, normal movement of all extremities, normal gait and station, intact sensation and coordination, normal mood and affect, normal recent and remote memory, and good judgment. (*Id*.). Unlike in *Browning*, Plaintiff never complained to her doctors of musculoskeletal pain, fatigue, or difficulty walking anytime from January 2017 (some seven months before the August 4, 2017 alleged disability onset date) through October 2018. (R. 19). Also distinguishing *Browning* is the fact that the consulting physicians were aware of Plaintiff's morbid obesity when they determined that she has no severe impairments or functional restrictions. (R. 64-65, 70-71, 81, 89). Nonetheless, recognizing that morbid obesity can be limiting in and of itself, the ALJ reasonably restricted Plaintiff to medium as opposed to heavy or very heavy work. (R. 20).

Viewing the record as a whole, the ALJ's RFC determination sufficiently accounts for Plaintiff's morbid obesity in combination with her other impairments and is supported by substantial evidence. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (the Court "cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled."). As the

Supreme Court has noted, "[s]ubstantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).  The ALJ's decision satisfies this threshold.

### 3. Plaintiff's Subjective Statements

In the absence of objective evidence of impaired functioning, Plaintiff is left with her own testimony that she cannot perform the requirements of medium work.  The regulations describe a two-step process for evaluating a claimant's own description of her impairments.  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain."  SSR 16-3p, at *2.  If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  *Id*.  In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court is to give the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong," i.e., if it "lacks any explanation or support."  *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying."  *Sims v. Barnhart*, 442 F.3d 536, 538 (7th

Cir. 2006).  The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is "patently wrong."  *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018).

Plaintiff testified that she quit working because of weakness and tingling in the right hand and arm and an inability to stand and walk for very long.  (R. 36-37, 42-43). According to Plaintiff, she is only able to walk a couple of feet, stand for 5 to 10 minutes before having trouble breathing, sit for 45 minutes, and lift one gallon but not two.  (R. 44, 45, 50, 52).  She also has difficulty talking.  (R. 37).  Plaintiff can bathe and dress herself and do the grocery shopping if she uses an electric chair, and climb stairs up to her second floor apartment.  (R. 42, 45, 49).  Though Plaintiff is able to do some cleaning, cooking, and dishwashing, she does those tasks halfway and then her children take over. (R. 49).  Her children also accompany her when she drives a couple times a week "just in case something would happen."  (R. 34-35).  Plaintiff testified that she never leaves the house without a 4-pronged cane, which she brought to the hearing and needs in order to stand up, and has been using the assistive device consistently since a physical therapist gave it to her in January 2017.  (R. 42, 50, 51).  On a typical day, she plays games on her phone for a couple of hours.  (R. 48).

In discounting Plaintiff's testimony, the ALJ first found it inconsistent with objective medical evidence showing normal exams from at least August 2017 forward.  (R. 19, 453, 457, 463, 485, 3403, 3406, 3413, 3420, 3424, 3430, 3437).  Plaintiff insists that the exams "have been anything but normal," once again relying on records from her hospitalizations in late July/early August 2017 and April 2018.  (Doc. 15, at 12-13).  As explained earlier, however, Plaintiff's symptoms of weakness and numbness in the right arm and hand fully resolved as of August 15, 2017 (R. 18, 457, 3437), and tests showed nothing at all

20

medically wrong with her in April 2018.  (R. 19, 3036).  Plaintiff correctly notes that a December 6, 2017 ED record referenced a January 21, 2017 report of impaired verbal communication, but there is no evidence that this remained a problem after January 2017 and, as discussed, Plaintiff's exams were consistently normal.  *See Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record.").

The ALJ also found Plaintiff's statements unpersuasive because she made no complaints of musculoskeletal pain, fatigue, or difficulty walking, or present to medical appointments with a cane after January 2017.  (R. 19).  Plaintiff says nothing about this evidence.  Plaintiff similarly fails to challenge the ALJ's observation that she takes only three medications (iron pills, aspirin, and Metformin to control blood sugar), has not been treated by a neurologist or other specialist since December 2016, and has not pursued any outpatient physical or occupational therapy since June 2016.  (R. 17-19, 517).  This record of minimal and conservative treatment undermines Plaintiff's assertion that she is suffering from disabling symptoms that render her largely unable to sit, stand, walk, lift, and carry.  *See, e.g., Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (receipt of conservative treatment is a legitimate reason to find a claimant not entirely credible"); *Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *11 (N.D. Ill. Apr. 16, 2014) ("The lack of prescription medication is inconsistent with a finding of disabling pain.").  Plaintiff's unsupported speculation that "one can only surmise that, with her growing list of impairments, her condition deteriorated as treatment became more complicated" (Doc. 15, at 13), finds no support in the record.  *See Stewart v. Berryhill*, 731 F. App'x 509, 510

(7th Cir. 2018) ("Unsubstantiated claims are of course, no substitute for evidence.") (internal quotations omitted).

Plaintiff next argues that the ALJ erred by not acknowledging that she demonstrated confusion about her own condition, such as her failure to recall a recommendation that she undergo bariatric surgery or the fact that she was diagnosed with a conversion disorder. (Doc. 15, at 14) (citing R. 37, 41). In Plaintiff's view, this confusion "suggests that there may have been other treatment options recommended from time to time, which she either rejected or did not understand." (*Id.*). Yet Plaintiff does not articulate what these other treatment options might be and none appear in the medical records. As for the conversion disorder, Plaintiff does not allege that she has any mental impairments, nor has she received any treatment for a mental condition. Dr. Bains's mental status exams were routinely normal and he never referred her for psychological or psychiatric care. In such circumstances, the ALJ did not err in rejecting Plaintiff's complaints of confusion and difficulty concentrating.

Plaintiff finally objects that the ALJ improperly equated her ability to perform certain activities of daily living with an ability to work. (Doc. 15, at 14). This is incorrect. The ALJ simply determined that Plaintiff's ability to drive, walk up and down stairs, and do some cooking and cleaning is one factor weighing against the reliability of Plaintiff's statements. (R. 17, 19). The Court finds no error in this analysis. *See Burmester*, 920 F.3d at 510 ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules.").

"The ALJ's credibility assessment need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)). Viewing the record as a whole, the ALJ provided several valid reasons for discounting Plaintiff's complaints of disabling symptoms and inability to perform medium work, and that decision is supported by substantial evidence.

### 4. Summary

To summarize, the ALJ did not commit reversible error in finding that Plaintiff has the RFC for a full range of medium work. In reaching this conclusion, the ALJ reasonably determined that Dr. Bains's opinion was unpersuasive, she properly considered Plaintiff's morbid obesity, and she fairly discounted Plaintiff's subjective statements of disabling symptoms. Since the ALJ's decision is supported by substantial evidence, the case need not be remanded for further evaluation.

### CONCLUSION

For reasons stated above, Plaintiff's Motion for Summary Judgment [15] is denied. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: April 13, 2022

SHEILA FINNEGAN
United States Magistrate Judge